**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Merle Ellis OWENS,**
**Defendant-Appellant.**

No. 84–1085.

United States Court of Appeals,
Tenth Circuit.

Jan. 22, 1986.

Fred L. Staggs (Frank R. Courbois with him on the brief), Oklahoma City, Okl., for defendant-appellant.

James F. Robinson, Asst. U.S. Atty. (William S. Price, U.S. Atty., with him on the brief), Oklahoma City, Okl., for plaintiff-appellee.

---

Before BARRETT, Circuit Judge, McKAY, Circuit Judge, and CARRIGAN, District Judge *.

CARRIGAN, District Judge.

Appellant, Merle Ellis Owens, appeals his conviction of possessing cocaine with intent to distribute in violation of 21 U.S.C. § 841(a)(1) (1982). Contending that his conviction was based on erroneous admission of evidence obtained in an unlawful search of his motel room that violated his Fourth Amendment rights, he asserts that his conviction must be reversed.

## BACKGROUND

A detailed recitation of the facts is essential to understand Owens' contentions because they turn on whether at the time his motel room was searched he still had a protected status in that room. On September 8, 1983, Owens checked into the Pebbletree Inn in Oklahoma City, Oklahoma, paying $28.45 for a one night single occupancy. He failed to check out by the regular checkout time, noon the next day, and some time after noon, Pebbletree personnel telephoned his room to determine whether he

* Honorable Jim R. Carrigan of the United States District Court for the District of Colorado, sitting by designation.

wished to extend his stay. Apparently in response to that call, at about 3:00 p.m. Owens' companion Cheryl Jones deposited $100 with the front desk clerk as advance rental payment on Owens' account.

The parties dispute the effect of this deposit. Owens testified that the desk clerk had assured him that a $100 deposit, together with his initial $28.45 payment, would secure for him the $106.00 per week rental rate in lieu of the higher daily rate. Cheryl Jones corroborated this testimony. But Beverly Martin, Pebbletree's night manager, testified that all weekly rate rentals required the approval of the general manager, Jack Henry, and that weekly rate tenants were assigned to rooms in a separate part of the motel. Owens did not move to the weekly rental section of the Inn, and Jack Henry testified that to his knowledge Owens was a day-to-day tenant. The desk clerk with whom Owens allegedly struck the weekly rental deal did not testify at the trial.

If Owens was a weekly rate guest, he had paid for his room through noon of September 13, 1983. On the other hand, if he was a day-to-day occupant, his $128.45 payment would have covered his room charges only through noon of September 12, 1983. But $4.30 more would have paid for an additional night, through September 13. The motel room search at issue occurred after noon on September 12.

During his stay, Owens had incurred approximately $16.00 in long distance telephone charges. Henry testified that a weekly renter would pay such phone charges at checkout. The night manager, however, testified that telephone charges would have been deducted daily from a cash-paying day-to-day tenant's account.

Even assuming that the $16.00 in telephone charges had been deducted daily, the account, if it was a weekly rate account, would have been fully paid through noon on September 12, with a $7.86 balance remaining.

On September 11, 1983, an unusually high volume of calls to Owens' room aroused the motel staff's suspicion. Charles Epperly, a police officer who worked part-time as a motel security guard, watched the room from 10:30 that night until 7:00 the next morning. He observed several people visit the room for five or ten minutes each. Owens returned to his room at 2:45 a.m. on September 12. Epperly checked the license plate on Owens' car with the police, but was informed that the car was not stolen. At 7:00 a.m. Epperly left the Inn to report to work on his regular full-time job as an Oklahoma City police officer.

Epperly, with his police partner John Matthews, returned to the Pebbletree shortly before 7:30 a.m. He then ran a second check on Owens' license plates and this time turned up a report that they were stolen. On the advice of their supervisor, Sergeant Campbell, Officers Epperly and Matthews decided not to arrest Owens immediately, but rather to wait until he returned to his car. The two officers watched Owens' room from another room diagonally across the Inn's parking lot until shortly after 12:00 noon. During that time they observed a blonde woman, later identified as Cheryl Jones, looking out of Owens' window.

Shortly after noon on September 12, Epperly enlisted James Digby, a plain-clothes policeman, to assist them. Posing as a Pebbletree employee, Digby knocked on Owens' door and asked Owens to move his car so that the parking lot could be cleaned. Owens' car was parked several spaces away from his room's window. When Owens got into the car, Epperly arrested him for receiving stolen property. Owens was taken around a corner of the Inn and handcuffed to an iron staircase. The officers returned to the room from which they had been watching Owens' room and called the front desk to apprise the motel of the arrest and that one occupant still remained in Owens' room.

Jack Henry told the officers that the room had been rented for one person only,

and that Owens' term of paid occupancy had expired. Henry further told the police that he would file a complaint for trespassing past check-out time and for defrauding an innkeeper. Henry testified, however, that although he had authorized the police to get Cheryl Jones out of the room he had not authorized any search of the room or of Owens' luggage.[1]

Owens urged the officers not to enter his room because his girlfriend was sleeping there naked. Despite Owens' protests, Epperly entered the room, and seeing Cheryl Jones sleeping unclad on the bed, he tried unsuccessfully to awaken her. Epperly quickly scanned the rest of the room, including the bathroom, and found no one else present. Marijuana cigarettes, white powder and drug paraphenalia were in plain view.

Unsure of how to proceed, Officers Epperly and Digby called for Sergeant Campbell and waited for him in Owens' room. Upon arrival there, Campbell covered Jones with a sheet and shook her for twenty or thirty seconds to awaken her. She was then arrested, told to dress, and taken from the room.

Sergeant Campbell then ordered a complete search of the room, and it was searched without a warrant. Inside a closed dresser drawer the officers found a cloth bag secured at the top with a draw string. They opened the closed bag and found over two ounces of cocaine.

At no time during the more than five and one-half hours after the officers first had probable cause to arrest Owens did they make any attempt to obtain a warrant. Even after the marijuana and drug paraphenalia were observed in the room, and after both suspects were in custody with the police in full control of the room, no warrant was sought.

At the hearing on Owens' motion to suppress the cocaine as evidence, Officer Ep-

perly first testified that he had entered Owens' room because Henry had said he wanted the extra occupant out. Epperly later testified that he had entered the room as standard police procedure to secure the area surrounding the site of the arrest.

The trial court, 607 F.Supp. 140, found that exigent circumstances justified entry of Owens' room in order to neutralize the possibility of harm to the police from Cheryl Jones. The court further ruled, however, that none of the exceptions to the warrant requirement permitted the officers to search inside either the closed dresser or the closed bag. Despite his ruling that the search violated the Fourth Amendment, the trial judge refused to apply the exclusionary rule because, in his view, the officers had acted in good faith. Recognizing that the Supreme Court's precedents had not yet extended this far, the trial judge apparently predicted from the trend of recent opinions that the law's development would carry it beyond the point where the instant search would be considered lawful. Thus the issue distills to whether this court agrees with the trial judge's assessment of how far the Supreme Court has gone in its recent course of broadening police search powers vis-a-vis Fourth Amendment protection.

## APPLICATION OF THE FOURTH AMENDMENT

Appellee argues that the Fourth Amendment did not protect Owens because he had no reasonable expectation of privacy in his motel room after his paid occupancy expired at noon on September 12. It is settled that a motel guest is entitled to constitutional protection against unreasonable searches of his or her room. *Stoner v. California*, 376 U.S. 483, 490, 84 S.Ct. 889, 893, 11 L.Ed.2d 856 (1964); *United States v. Anthon*, 648 F.2d 669 (10th Cir.1981). The issue here is whether Owens had abandoned that protection by remaining in his

---

1. No trespassing or defrauding charges were ever filed. In fact, at the time of trial Owens'

account still showed a cash balance of $7.86.

room past the noon check-out time on the day of the search, September 12.

 Subtle distinctions of state landlord-tenant law cannot control the paramount constitutional question of whether Owens still had a privacy interest in his motel room when it was searched. *See Jones v. United States,* 362 U.S. 257, 266, 80 S.Ct. 725, 733, 4 L.Ed.2d 697 (1960). The Fourth Amendment protects people, not places. *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Justice Harlan's oft quoted concurring opinion in *Katz* thus explained the standard:

> "[T]he rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation be one that society is prepared to recognize as 'reasonable.' *Id.* at 361, 88 S.Ct. at 516.

Here Owens testified that he believed his $100 deposit had converted his status to that of a weekly rate tenant. His vigorous attempts to persuade the police not to enter his room further demonstrated that he held a subjective expectation of privacy.

Moreover, Owens' expectation appears to have been eminently reasonable. The record reflects that a reasonable person in Owens' situation might well have expected a weekly rental rate in exchange for a $128.45 advance deposit. All motel guests cannot be expected to be familiar with the detailed internal policies and bookkeeping procedures of the inns where they lodge. Even assuming that Owens was renting on a day-to-day basis, his reasonable expectation of privacy continued past check-out time for at least the short period in question here. On September 9, Owens had remained in his room past check-out time without consequence. Some time after noon, on the 9th, the Inn merely had inquired politely whether he planned to stay an extra day. Eventually, after 3:00 p.m., he had paid in advance for continued occupancy.

Thus Owens' presence in the room after noon on September 12, together with his prior conduct, strongly suggested that he intended to continue his stay. It would be surprising indeed if the motel regularly authorized police entry and search of the room of every guest who failed to comply strictly with the noon checkout time requirement. Such a practice would quickly solve the problem of late checkouts, for few if any guests would ever check in to a motel thus operated.

Pebbletree's manager testified that it was the Inn's policy to inquire of a holdover guest after check-out time to ascertain whether he or she intended to stay an extra day. Clearly it was not the Inn's ordinary business practice to call the police to evict guests who were late checking out.

 Even if Pebbletree had a legal right forcibly to evict Owens in order to clear his room for the next occupants, neither it nor the police had any right to search his luggage or other closed containers. Consequently, even if Owens did not retain a protected privacy interest in his room when the police entered, it certainly would have been reasonable for him to expect that the contents of closed containers he kept in his room would not be exposed to scrutiny by the police or motel personnel. Thus, we hold that at the time of the search Owens had a reasonable expectation of privacy in his motel room and in the contents of the closed bag inside the dresser drawer. For that reason a warrant was required to justify the search, absent application of some exception to the warrant requirement.

## EXCEPTIONS TO THE WARRANT REQUIREMENT

 The government contends that exceptions to the warrant requirement justified the search. First, asserts the government, Pebbletree's manager consented to the search of Owens' room. A lessor, however, cannot effectively consent to a police search of an area leased exclusively to a tenant. *Stoner v. California,* 376 U.S. 483, 84 S.Ct. 889, 11 L.Ed.2d 856 (1964).

Under the circumstances here presented, Owens' occupancy had not definitely expired, and thus he had a continuing reasonable expectation of privacy in his room. Therefore, the Pebbletree manager did not have authority to consent on his behalf to a search. Moreover, the manager testified that he had not consented to a search of any drawers in Owens' room or to a search of Owens' luggage. Rather, he merely had authorized the removal of suspected trespassers. Accordingly, the manager's "consent" did not justify the officers' exhaustive search of Owens' room or of the dresser drawer and its contents.

The government argues that following Owens' felony arrest, the potential danger from Cheryl Jones, known by the police to be in Owens' room, justified the room search as a "protective sweep" of the arrest area. In *United States v. Riccio*, 726 F.2d 638, 641 (10th Cir.1984) this court stated, "When officers have arrested a person inside his residence, the exigent circumstances exception permits a protective search of part or all of the residence when the officers reasonably believe that there might be other persons on the premises who could pose some danger to them." There, however, the officers had heard several shots fired from different places within the residence. Here the officers were informed that there was a young woman sleeping nude in the room. While both situations no doubt presented some possible dangers, they are not comparable as predicates to support the exigent circumstances exception.

■ The Fifth Circuit has expanded the protective sweep exception of the warrant requirement by allowing a protective sweep of a hotel room following an arrest in the hall outside the room. *United States v. Sheikh*, 654 F.2d 1057 (5th Cir.1981). Other circuits have also allowed warrantless protective sweep searches. *See United States v. Irizarry*, 673 F.2d 554 (1st Cir. 1982); *United States v. Baker*, 577 F.2d 1147 (4th Cir.1978) *cert. denied* 439 U.S. 850, 99 S.Ct. 154, 58 L.Ed.2d 153 (1978); *United States v. Spanier,* 597 F.2d 139 (9th Cir.1977). A strong current running through all these cases indicates that protective sweeps are appropriate only where officers reasonably perceive an immediate danger to their safety. *See United States v. Kinney*, 638 F.2d 941 (6th Cir.1981) *cert. denied* 452 U.S. 918, 101 S.Ct. 3056, 69 L.Ed.2d 423 (1981). A protective sweep is not a thorough search. It is merely a quick and cursory viewing to check for other persons who might present a security risk. *United States v. Blake*, 484 F.2d 50 (8th Cir.1973). *See generally* 2 W. LaFave, *Search and Seizure*, 427 (1978).

■ The instant facts fail to justify applying the protective sweep exception to the warrant requirement. After Owens' arrest, the officers retreated to their surveillance room located diagonally across the parking lot from Owens' room. From there they called the manager to advise him of the situation. Once the officers had retreated to a safe position, from which they were able to watch Owens' room with no danger to themselves or others, the exigency they relied upon in performing the protective sweep no longer existed. Certainly, at this point they had time and opportunity to obtain a warrant to search the room.

■ In any event we need not here decide the constitutionality of the protective sweep. Assuming *arguendo* that Epperly and Digby properly entered Owens' room to perform a cursory investigation for dangerous cohorts, the complete room search clearly exceeded the scope of a protective sweep. The officers' stated objective of securing the immediate arrest area can not be stretched to justify their searching the closed bag found within a closed drawer.

## EXCLUSIONARY RULE

The trial judge correctly ruled that the police discovered the cocaine in an unconstitutional search, but he nevertheless declined to exclude the evidence. Recently, the United States Supreme Court has recognized a limited exception to the exclu-

sionary rule. Where officers acting in good faith obtain a search warrant which later proves invalid, the exclusionary rule does not prevent admission of evidence obtained as a result of the search executed pursuant to that warrant. *Massachusetts v. Sheppard*, 468 U.S. 981, 104 S.Ct. 3424, 82 L.Ed.2d 737 (1984); *United States v. Leon*, — U.S. —, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Sheppard*, the police obtained incriminating evidence in a search conducted pursuant to a warrant that was later found invalid because it failed to describe with particularity the items to be seized. The Court there declined to exclude the evidence because the officers' good faith efforts to obey the warrant requirement demonstrated that the exclusionary rule's purpose—to deter unlawful police conduct—had no application in those circumstances. Similarly, in *Leon*, the police obtained a search warrant that ultimately was found to be unsupported by probable cause. The Supreme Court held that the exclusionary rule did not apply because the officers in good faith had done all they could to adhere to the Fourth Amendment's mandate.

■ We hold that the "good faith" exception to the exclusionary rule does not apply in the circumstances here presented. Officers Epperly and Matthews watched Owens' room for five and one-half hours without making any attempt to obtain a search warrant. After entering the room, observing controlled substances in plain view, and arresting Jones, they had yet another opportunity to secure a warrant without in any way jeopardizing themselves or the evidence, but no warrant was sought. Indeed, even after they had secured the closed bag, they could have procured a warrant to open and search it, but they failed to do so. Their failure to comply with the warrant requirement despite repeated opportunities exemplifies the very type of official conduct the exclusionary rule is intended to deter. We conclude, therefore, that the good faith exception to the exclusionary rule did not apply.

As an alternative ground for affirmance, the government claims that the inevitable discovery exception to the exclusionary rule permitted the cocaine to be admitted into evidence at the trial. In *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984), the Supreme Court recognized the rule, already adopted in all the circuits, that unlawfully obtained evidence may be admitted at trial if an independent, lawful police investigation inevitably would have discovered it. We adopted this rule in *United States v. Romero*, 692 F.2d 699 (10th Cir.1982).

All the cases that have endorsed the inevitable discovery exception have relied upon independent, untainted investigations that would have inevitably uncovered the same evidence. The *Nix v. Williams* opinion emphasized the necessity of an *independent* investigation by delineating the close connection between the independent source rule and the inevitable discovery exception. There Justices Brennan and Marshall, in dissent, thus capsulized the majority's holding:

> "In particular, the Court concludes that unconstitutionally obtained evidence may be admitted at trial if it inevitably would have been discovered in the same condition by an independent line of investigation that was already being pursued when the constitutional violation occurred." at —, 104 S.Ct. at 2517.

Here, the unconstitutional search of the closed bag inside the closed dresser drawer tainted the only police investigation that was ongoing. Clearly these officers were not conducting an independent investigation that inevitably would have uncovered the cocaine.

The government argues that the motel maid's routine cleaning of Owens' room for the next occupant would have revealed the contraband. But we are reminded of our cautionary statement in *Romero*: "We recognize the danger of admitting unlawfully obtained evidence 'on the strength of some judge's speculation that it would have been

discovered legally anyway'...." *Romero,* 692 F.2d at 704 (quoting *United States v. Castellana,* 488 F.2d 65, 68 (5th Cir.1974) *rev'd on other grounds,* 500 F.2d 325 (5th Cir.1974)). Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine. First, if the Pebbletree's staff had cleared Owens' room, they would not necessarily have opened and searched all his luggage and closed containers. In fact, such an intrusion would have been a significant invasion of his privacy. Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable. The evidence certainly does not demonstrate that the Inn's staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it. Finally, absent the unlawful search, Owens might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either the cleaning staff or the police discovered the contraband. Alternatively, a friend could have returned to claim the closed bag.

We conclude that the inevitable discovery exception to the exclusionary rule cannot be invoked because of the highly speculative assumption of "inevitability" that would be required to apply it here.

## CONCLUSION

For the reasons stated, we conclude that the appellant's Fourth Amendment protection against warrantless searches was violated. We hold that it was reversible error to admit at trial the evidence obtained as a result of the unlawful search. The appellant's conviction is therefore reversed, and the case is remanded for a new trial or other proceedings consistent with this opinion.