**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

JAY YANG,
*Defendant-Appellant.*

No. 18-10341

D.C. No.
2:16-cr-00231-RFB-1

OPINION

Appeal from the United States District Court
for the District of Nevada
Richard F. Boulware II, District Judge, Presiding

Argued and Submitted November 12, 2019
San Francisco, California

Filed May 4, 2020

Before: Carlos T. Bea and Kenneth K. Lee, Circuit Judges,
and Lawrence L. Piersol,[*] District Judge.

Opinion by Judge Piersol;
Concurrence by Judge Bea

---

[*] The Honorable Lawrence L. Piersol, United States District Judge
for the District of South Dakota, sitting by designation.

## SUMMARY[**]

### Criminal Law

The panel affirmed the district court's denial of a suppression motion in a case in which the defendant entered a conditional guilty plea to receipt of stolen mail and being a prohibited person in possession of a firearm.

After the defendant was observed on surveillance cameras driving a rented GMC Yukon and stealing mail out of post office collection boxes, a Postal Inspector located the defendant at his residence, and the Yukon, by inputting the Yukon's license plate number into a license-plate location database, which receives license plate images and the GPS coordinates from digital cameras mounted on tow truck, repossession company, and law enforcement vehicles.

The defendant moved to suppress the evidence seized from his residence and the statements he made to law enforcement on the basis that the automatic license plate recognition technology used by the Postal Inspector without a warrant violated his Fourth Amendment right to privacy in the whole of his movements under *Carpenter v. United States*, 138 S. Ct. 2206 (2018).

The panel held that the defendant did not have a reasonable expectation of privacy in the historical location data of the rental vehicle after failing to return it by the contract due date, where there was no policy or practice of

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

the rental company permitting lessees to keep cars beyond the rental period and simply charging them for the extra time. The panel concluded that the defendant therefore lacked standing to challenge the warrantless search of the database.

Judge Bea concurred in the judgment. He disagreed with the majority's holding that because the defendant's lease on the Yukon had expired when its license plate was photographed by the automatic license plate reader, he has not alleged a violation of his reasonable expectation of privacy and therefore lacks standing to challenge the warrantless search of the database. He would affirm on the grounds that the search of the database did not reveal the whole of the defendant's physical movements, and therefore did not infringe on that reasonable expectation of privacy.

## COUNSEL

Cristen C. Thayer (argued), Assistant Federal Public Defender; Rene L. Valladares, Federal Public Defender; Office of the Federal Public Defender, Las Vegas, Nevada; for Defendant-Appellant.

Nancy M. Olson (argued) and Phillip N. Smith Jr., Assistant United States Attorneys; Elizabeth O. White, Appellate Chief; Nicholas A. Trutanich, United States Attorney; United States Attorney's Office, Las Vegas, Nevada; for Plaintiff-Appellee.

Jennifer Lynch and Andrew Crocker, Electronic Frontier Foundation, San Francisco, California; Nathan Freed Wessler and Brett Max Kaufman, American Civil Liberties Union Foundation, New York, New York; Jennifer S.

Granick, American Civil Liberties Union Foundation, San Francisco, California; Amy M. Rose, American Civil Liberties Union of Nevada, Las Vegas, Nevada; for Amici Curiae Electronic Frontier Foundation, American Civil Liberties Union, and American Civil Liberties Union of Nevada.

---

**OPINION**

PIERSOL, District Judge:

In April 2016, Defendant Jay Yang was observed on surveillance cameras driving a rented GMC Yukon and stealing mail out of collection boxes at the Summerlin Post Office in Las Vegas, Nevada. When U.S. Postal Inspector Justin Steele spoke with representatives of Prestige Motors, from which Yang rented the Yukon, he was informed that the vehicle was approximately six days overdue and that Prestige had attempted to repossess the vehicle by activating its Global Positioning System unit ("GPS") and remotely disabling the vehicle. Inspector Steele was also informed that the vehicle was not at the location indicated and that the GPS unit was no longer functioning, apparently having been disabled by a third party.

Two days later, Inspector Steele queried the largest license plate-location database in the country, operated by a private company called Vigilant Solutions, with hopes of locating the Yukon and Yang. This database receives license plate images and GPS coordinates from digital cameras mounted on tow truck, repossession company, and law enforcement vehicles. These camera-mounted vehicles photograph any license plate they encounter while driving around in the course of business. The Automatic License

Plate Recognition ("ALPR") technology loaded on a laptop inside the camera-mounted vehicles interprets the alphanumeric characters depicted on the plate into machine-readable text and records the latitude and longitude of a vehicle the moment it photographs a license plate. The software also generates a range of addresses estimated to be associated with these GPS coordinates. This information is uploaded to the database and is searchable by law enforcement agencies that pay a subscription fee.

In December 2016, there were approximately 5 billion license plate scans and associated data stored in the database. The database continues to grow as these camera-mounted vehicles go about their daily business capturing images and location data at thirty frames per second, and as the use of these cameras and technology becomes more ubiquitous. It was estimated that as of March 2019, the database contained over 6.5 billion license plate scans and affiliated location data.

When Inspector Steele inputted the license plate number for the Yukon in the LEARN database, his query revealed that it had been photographed on April 5, 2016, at approximately 11:24 p.m., after the deadline to return the Yukon had passed. Inspector Steele promptly proceeded to the gated condominium complex that had been identified by the ALPR software as most closely associated with the GPS coordinates of the repossession vehicle at the time it photographed the Yukon's plate. In short order, Inspector Steele located Yang at his residence as well as the Yukon. After further investigation and visual surveillance, Inspector Steele obtained a warrant to search Yang's residence. There, he found devices known to be used for stealing mail out of mailboxes, numerous pieces of stolen mail, and a Phoenix Arms model HP22 pistol. After waiving his *Miranda* rights,

Yang spoke to law enforcement and admitted to stealing mail from collection boxes in the area and to owning the firearm.

Yang moved to suppress the evidence seized from his residence and the statements he made to law enforcement on the basis that the search warrant obtained by the Postal Inspection Service relied on evidence that was obtained illegally. Yang argues that the ALPR technology used by Inspector Steele without a warrant to track and locate Yang at his residence violated his Fourth Amendment right to privacy on the whole of his movements under *Carpenter v. United States*, 138 S.Ct. 2206 (2018)—a decision issued by the Supreme Court after Yang's motion to suppress was denied.

We have jurisdiction under 28 U.S.C. § 1291 and affirm the district court's decision denying Yang's motion to suppress. We do not address the potential Fourth Amendment privacy interests that may be implicated by the warrantless use of this ALPR technology because we conclude that Yang does not have a reasonable expectation of privacy in the historical location data of the Yukon under the facts of this case.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.  Warrant and Search

In April of 2016, the U.S. Postal Inspection Service received information that mail theft was occurring at the Summerlin Post Office located in Las Vegas, Nevada. On April 6, 2016, Postal Inspector Steele obtained video footage from surveillance cameras at the Summerlin Post Office which showed a person engaging in "fishing"—a method of stealing mail from a mailbox in which an individual lowers

an object—which usually has adhesive or some grasping mechanism—into the box and then retrieves mail from the box by pulling it out with this object.

The surveillance footage showed that on April 5, 2016, at 2:17 AM, a slim Asian or white male with short hair exited a dark colored GMC Yukon ("Yukon") and placed a fishing device into the collection box. Although the April 5th surveillance footage showed the individual losing his fishing device in the collection box prior to removing mail, surveillance video on April 6, 7 and 8, 2016, showed the same individual exit the Yukon and use a fishing device to remove mail from the collection box. The surveillance video did not capture a discernable license plate for the Yukon on those days.

On April 7, 2016, afternoon surveillance video from the Summerlin Post Office revealed another vehicle, a Budget rental truck with Oklahoma license plate 2QD483 ("Budget Truck"), with what appeared to be the same driver as that of the Yukon on the previous days. On this day, the driver again was observed on the video engaging in fishing activity with a collection box.

On April 9, 2016, the Yukon was again observed on surveillance video with the same driver engaging in "fishing" activities as seen on the previous days. On this day, the license plate for the Yukon was viewable and was identified as California license plate 7RIV310.

On April 11, 2016, Inspector Steele conducted a DMV records check for the Yukon and its license plate number and learned that the vehicle was registered to Prestige Motors, a car rental company located in Las Vegas, Nevada. That same day, Inspector Steele visited Prestige Motors to obtain additional information. There, he learned that the Yukon

had been reserved and rented on a third-party website by Jay Yang. The contract rental period began on April 2, 2016, and the vehicle was due back on April 5, 2016, at 10:48 a.m., but had not yet been returned. The credit card used to complete the transaction was subsequently revealed to be stolen.

Inspector Steele testified at the suppression hearing that Prestige had attempted to repossess the vehicle by activating its GPS unit and remotely disabling the vehicle. Inspector Steele was also informed that the vehicle was not at the location indicated by the GPS unit and that the GPS unit was no longer functioning, apparently having been disabled by a third party. Although a representative of Prestige Motors stated that Prestige considered the vehicle to be stolen, Prestige had not filed a stolen vehicle report with the police.

On April 12, 2016, Inspector Steele contacted Budget Truck Rental ("Budget") and obtained the rental information for the Budget Truck that had been viewed in the surveillance video on April 7, 2016. Inspector Steele was informed that the Budget Truck had been rented to Jay Yang on March 14, 2016, and had not been returned by the contract due date on March 16, 2016.

On April 13, 2016, Inspector Steele requested a vehicle detection report for the Yukon through a license plate-location database called LEARN. The LEARN database was created and is maintained by a private company named Vigilant Solutions. The LEARN database receives license plate images from digital cameras mounted on tow truck, repossession company and law enforcement vehicles. These camera-mounted vehicles photograph at thirty frames per second any license plate they encounter while driving around in the course of business. ALPR technology loaded on a laptop inside the camera-mounted vehicles interprets the

alphanumeric characters depicted on the plate into machine-readable text and records the latitude and longitude of a vehicle the moment it photographs a license plate. The software also generates a range of addresses estimated to be associated with these GPS coordinates. This information is uploaded to and stored in the database for years after its collection, and is searchable by law enforcement and government agencies that pay a subscription fee.

The LEARN database receives about thirty-five percent of its images from law enforcement vehicle cameras and the remaining sixty-five percent of its images from commercial vehicle cameras. Access to the LEARN database is limited to law enforcement subscribers. The Postal Inspection Service has a user access subscription to the LEARN database, but does not contribute any images to the database. There is a companion database used by commercial clients, but this database only contains information obtained from commercial vehicles, not law enforcement vehicles. All commercial scans and attendant location information are transferred to the LEARN database and law enforcement has access to those commercial scans.

At the suppression hearing, Mr. Hodnett, president of the holding company of Vigilant Solutions, testified that there were approximately 5 billion license plates scans and affiliated location data stored in LEARN's database and that on average, the license plate for any particular vehicle is scanned and uploaded to the database approximately four times per year. Inspector Steele testified that his queries of the LEARN database have sometimes produced one record, sometimes twenty, and sometimes none at all. While there was no evidence in the record that definitively established how long scans and location data are retained in the LEARN database, Inspector Steele testified that vehicle detection

reports he has received from the database, have returned records "go[ing] back years."

The LEARN database continues to grow. The amici brief noted that as of March 2019, it was estimated that the company's commercial database alone had grown to include over 6.5 billion license plate scans.

The LEARN database also maintains license plate numbers of vehicles that have been reported stolen and those reported as being associated with a crime. Users can receive real-time alerts when a license plate number has been captured that matches one of those flagged in the database as being associated with a crime. In addition, the database permits subscribers to search for license plate numbers captured within a certain time period and radius of where a crime occurred.

The vehicle detection report[1] that Inspector Steele obtained on April 13, 2016, for the license plate associated with the Yukon showed the images of the license plate that had been captured and the software's first and second best interpretations of the alphanumeric characters on the license plate, 7RIV310, RIV310. The vehicle detection report showed that the images were captured on April 5, 2016, around 11:24 p.m. and identified the latitude and longitude of the camera-mounted vehicle[2] at the time it took the photographs. The database generated a range of addresses, 7810–7898 Tenshaw Ave., that were estimated to be

---

[1] As the district court had noted, there are actually two detection reports based on two images that had been captured of the license plate approximately a second apart.

[2] The images of the Yukon in the vehicle detection report had been taken by a commercial repossession vehicle.

associated with the GPS coordinates in the report and identified the nearest intersection as being Tenshaw Avenue and Devonhall Street.

On April 13, 2006, the same day that Inspector Steele obtained the vehicle detection report, he went to the area of Tenshaw Avenue where the repossession company captured images of the Yukon's license plate on April 5, 2006. Tenshaw Avenue is located within a large, gated condominium complex. To get to Tenshaw Avenue, Inspector Steele testified at the suppression hearing that he had to enter through the condominium complex's security gate using his law enforcement-issued transponder to open the gate. Once he passed beyond the gate, he had to make a left turn at the beginning of the complex, another right turn, and then a little left turn to arrive at Tenshaw Avenue. Once on Tenshaw Avenue, Inspector Steele observed the Yukon parked in a general community parking lot within the gated condominium complex. Inspector Steele testified that he would not have been able to see the Yukon from the entrance of the complex.

During Inspector Steele's first visit to the condominium complex, he spoke with a Postal Service letter carrier for the complex and learned that an Authorization to Hold Mail was in place as of April 5, 2016, with no listed end date, for Jay Yang at 7821 Tenshaw Ave. Unit #103, Las Vegas, Nevada 89145. As Inspector Steele left the area of 7821 Tenshaw Avenue on April 13, 2016, he observed the Budget Truck used for fishing mail on April 7, 2016, parked just outside of the area and across the street. Inspector Steele was able to observe, in plain view on the dashboard of the Budget Truck, fishing devices consistent with what he observed were used on the surveillance video.

Inspector Steele also obtained subscriber information from the local utility, NV Energy, for 7821 Tenshaw Ave. Unit #103. The subscriber information indicated that the power was turned on by "Jay Yang."

On April 19, 2006, Inspector Steele observed that Budget had taken repossession of the Budget Truck. The repossession company allowed Inspector Steele to look into the cab of the Budget Truck from the sidewalk with the doors open and he was able to observe fishing devices in the vehicle.

On April 25, 2016, Inspector Steele and Postal Inspector Hudson ("Inspector Hudson") engaged in a ruse by attempting to deliver a package to a fictitious person at 7821 Tenshaw Ave. Unit #103. Inspector Hudson knocked on the door and it was answered by a male who identified himself as "Jay Yang."

On May 6, 2016, a search warrant was served on the residence of 7821 Tenshaw Ave. Unit #103. Yang, along with three other individuals, were present at the residence when the search warrant was executed. Therein, law enforcement found fishing devices, numerous pieces of stolen mail, and a Phoenix Arms model HP22 pistol. Yang waived his *Miranda* rights and agreed to speak to law enforcement. During his conversation with law enforcement, Yang admitted to fishing from collection boxes in the area, including the collection boxes at the Summerlin Post Office, and stated that he used devices like those found at his residence to steal mail. Yang also admitted to owning the firearm that was recovered from his bedroom.

On May 6, 2016, Inspector Steel contacted Prestige Motors to notify them about the location of the Yukon. Representatives of Prestige came to 7821 Tenshaw to

repossess the vehicle. Prestige opened the doors of the vehicle and allowed contractors for the Postal Inspection Service to take pictures of the interior and Prestige Motors cleared the vehicle of its contents.

## II. Suppression Motion

In July 2016, a federal grand jury in the District of Nevada returned an indictment against Yang, charging him with receipt of stolen mail in violation of 18 U.S.C. § 1708, and being a prohibited person in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). In October 2016, Yang moved to suppress the evidence seized from his apartment and the statements he made to law enforcement on the basis that the search warrant obtained by the Postal Inspection Service relied on evidence that was obtained illegally. Yang argued that the ALPR technology used by Inspector Steele without a warrant to track and locate the Yukon within Yang's gated condominium complex constituted a "search" under the Fourth Amendment. The suppression motion was fully briefed by the parties.

The district court held an evidentiary hearing over the course of three days in December 2016 and January 2017, and the parties filed supplemental briefs in May 2017.

On November 20, 2017, the district court orally denied Yang's motion to suppress and issued its written order on January 25, 2018. In its written order denying Yang's motion, the district court held that there was no common-law trespass because: 1) the Yukon's license plate and associated location was only captured when the vehicle traveled on public streets; 2) no officer placed any device on the Yukon or used technology targeting the Yukon which would permit law enforcement officers to peer into areas thought to be

private by Yang or others; and 3) Yang did not have a reasonable expectation of privacy in the observation of the license plate of the vehicle he was driving on public streets. The district court also held that no "electronic trespass" had taken place that might implicate a reasonable expectation of privacy because: 1) the location information was not generated by Yang electronically or digitally surrendering private or confidential information to a third-party working in cooperation with law enforcement; 2) the location information for the Yukon was not identified by use of any invasive digital technology regarding its whereabouts or those of Yang; and 3) the location information was obtained through random observations recorded on public streets.

In April 2018, Yang pleaded guilty to the charged offenses, reserving the right to appeal the district court's denial of his motion to suppress. The district court accepted Yang's conditional plea and sentenced Yang to 35 months in prison and three years of supervised release. Yang timely appealed.

## STANDARD OF REVIEW

A district court's denial of a motion to suppress is reviewed *de novo*, while the factual findings underlying the denial of the motion are reviewed for clear error. *United States v. Gust*, 405 F.3d 797, 799 (9th Cir. 2005). "Whether or not an individual's expectation of privacy was objectively reasonable is also reviewed *de novo*." *Id.* (quoting *United States v. Bautista*, 362 F.3d 584, 589 (9th Cir. 2004)).

## ANALYSIS

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S.

Const. amend. IV. "The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable." *Morgan v. United States*, 323 F.3d 776, 780–81 (9th Cir. 2003) (quoting *Florida v. Jimeno*, 500 U.S. 248, 250 (1991)). Generally, "searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *See Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)).

Whether an individual has a Fourth Amendment privacy interest normally embraces two questions. *Bond v. United States*, 529 U.S. 334, 338 (2000). "First, we ask whether the individual, by his conduct, has exhibited an actual expectation of privacy; that is, whether he has shown that 'he [sought] to preserve [something] as private.'" *Id.* (quoting *Smith v. Maryland*, 442 U.S. 735, 740 (1979) (internal quotation marks omitted)). "Second, we inquire whether the individual's expectation of privacy is 'one that society is prepared to recognize as reasonable.'" *Id.* (quoting *Smith*, 442 U.S. at 740).

The burden of proof is on a defendant to demonstrate that he has a reasonable expectation of privacy in the subject of the Government's warrantless search. *See United States v. Caymen*, 404 F.3d 1196, 1199 (9th Cir. 2005).

I. **Did Yang have a reasonable expectation of privacy in his movements as revealed by the historical location data of a rental vehicle that was not returned by the rental contract due date?**

The Government argues that Yang does not have a reasonable expectation of privacy in the historical location

information of the Yukon because at the time the Government queried the LEARN database, the Yukon was approximately eight days overdue and Prestige Motors had attempted to repossess the vehicle by activating the vehicle's GPS unit and remotely disabling the vehicle.[3]　　The Government correctly framed its argument as an issue regarding the defendant's standing to challenge the alleged search in this case. *See United States v. Taketa*, 923 F.2d 665, 669–70 (9th Cir. 1991) ("[T]o say that a party lacks fourth amendment standing is to say that *his* reasonable expectation of privacy has not been infringed.").

While the mere expiration of the rental period does not automatically end a lessee's expectation of privacy, *see United States v. Dorais*, 241 F.3d 1124, 1129 (9th Cir. 2001), we conclude that Yang has failed to establish that he has a reasonable expectation of privacy in the historical location information of the Yukon under the facts of this case. There is no evidence in the record that Prestige Motors had a policy or practice of allowing lessees to keep cars beyond the rental period and Prestige had made affirmative attempts to repossess the vehicle by activating the GPS unit to locate and disable the vehicle. In so holding, we find instructive our decisions in *United States v. Dorais* and *United States v. Henderson*, 241 F.3d 638 (9th Cir. 2000) which both analyze

---

[3] The district court made no findings of fact regarding the attempts by Prestige Motors to repossess the vehicle, but concluded that "Yang did not have a right to be in possession of the vehicle . . . as he had not returned it pursuant to the Rental Agreement." Inspector Steele testified at the suppression hearing that he had been informed by Prestige Motors that when the GPS system in a vehicle is activated, it disables the vehicle. However, when Prestige Motors activated the GPS unit on the Yukon, the vehicle was not at the location indicated and the GPS unit was no longer functioning, apparently having been disabled by a third party.

a lessee's expectation of privacy in rental property after the expiration of the rental period.

## A.  Applicable Caselaw

In *United States v. Dorais*, police were informed by the hotel manager of suspicious activity occurring in the room occupied by defendants.  241 F.3d at 1126.  Although the manager was not informed that the occupants were subjects of a drug investigation, he was told to call the police if he noticed further suspicious activity.  *Id.* at 1126–27.  At 10 a.m. on the day of checkout, the hotel left a message on the voicemail of the defendants' room, reminding them of the noon checkout time.  *Id.* at 1127.  Although one defendant left the room before noon, the other defendant remained in the room beyond checkout time.  *Id.*  Shortly after noon, a housekeeper inquired when the remaining defendant would be checking out and was informed by the remaining defendant that he intended to check out at 12:30. *Id.*

Around noon, police officers inquired of the hotel manager whether the defendants had checked out.  *Id.*  The officers were informed that guests still remained in the room and that the manager wished to evict them if they stayed past the noon checkout time.  *Id.*  At approximately 12:40, the hotel manager, accompanied by six officers, knocked on the door and told the defendant that he was there to evict him. *Id.*  When the defendant opened the door, he was informed by an officer that the police would assist in the eviction.  *Id.* When the officers entered the room, they saw a substance on the coffee table that resembled methamphetamine and arrested the defendant.  *Id.*  A pat-down search incident to arrest yielded a substance resembling crystal methamphetamine.  *Id.*

In evaluating whether the defendants maintained a reasonable expectation of privacy in the hotel room at the time of the search, the court in *Dorais* examined two cases from the Tenth and Fourth Circuits, as well as our decision in *United States v. Henderson*, 241 F.3d 638 (9th Cir. 2000). In *United States v. Owens*, the Tenth Circuit held that the defendant maintained a reasonable expectation of privacy in his motel room although the checkout time had expired. 782 F.2d 146, 150 (10th Cir. 1986). There, after police arrested the defendant, they informed the motel manager of the arrest and told the manager that an occupant remained in the defendant's room. *Id.* at 148. The police were told that the rental period on the room had expired and the manager authorized officers to evict the remaining occupant who was not listed on the rental agreement. *Id.* at 148–49. Officers then entered the room and found white powder and drug paraphernalia in plain view. *Id.* at 149.

The court in *Owens* concluded that the defendant had a reasonable expectation of privacy in his hotel room even though the search occurred after the rental period had expired. *Id.* at 150. We noted in *Dorais* that the *Owens* court primarily based its conclusion on three factors. *Id.* First, when the defendant in *Owens* had stayed past checkout time prior to the search, instead of evicting him, the hotel permitted him to extend his stay and pay for the additional term of occupancy. *Dorais*, 241 F.3d at 1129 (citing *Owens*, 782 F.2d at 150). Second, the hotel manager in *Owens* testified that it was the motel's policy not to evict guests who were staying past checkout time for brief periods, but to ask them whether they would be leaving or extending their stay. *Id.* (citing *Owens*, 782 F.2d at 150). Third, the defendant had given a large cash deposit, which, the court found, may have led him to believe that he was paid up through the rest of the week. *Id.* (citing *Owens*, 782 F.2d at 150).

In contrast to *Owens*, we observed in *Dorais* that in *United States v. Kitchens*, the Fourth Circuit held that the defendants' expectation of privacy in their hotel room had expired at checkout time. *Dorais*, 241 F.3d at 1129 (citing *Kitchens*, 114 F.3d 29, 32 (4th Cir. 1997)). The court in *Kitchens* acknowledged that "[a] guest may still have a legitimate expectation of privacy even after his rental period has terminated, if there is a pattern or practice which would make that expectation reasonable." *Kitchens*, 114 F.3d at 32 (citations omitted). However, the court found that the defendants did not have a pattern or practice of staying past checkout time and that the hotel had a strict policy of enforcing checkout times.[4] *Id.* As a result, the court concluded that defendants' reasonable expectation of privacy in the room expired at the checkout time. *Id.*

In *Dorais*, we also considered our decision in *Henderson*, which is factually similar to the present case, because it involves a defendant's expectation of privacy in a rental vehicle possessed beyond the terms of the rental contract. *Dorais*, 241 F.3d at 1129. In *Henderson*, we held that the defendant had a reasonable expectation of privacy in a rental car even though the lease to the car had expired. *Henderson*, 241 F.3d at 647. In support of our holding, we noted that a representative of the rental company had testified that it was not unusual for customers to keep their rental cars beyond the terms of their rental agreements and that in such cases, the company would charge the customer's credit card for the late return. *Id.* In addition, we found that

---

[4] The motel manager in *Kitchens* testified at the suppression hearing that he had entered rooms and evicted occupants when they stayed past checkout time and had, on several occasions, called the police to assist him in evicting individuals who stayed past checkout without paying for an additional night. 114 F.3d at 30.

the rental company had not taken affirmative steps to repossess the vehicle. *Id.* Based on these facts, we concluded that "[e]ven though the rental agreement had expired, the parties to the agreement understood that [the defendant] would retain possession and control of the car and would in effect, continue to rent it." *Id.*

Taking into consideration the above-mentioned cases, as well as others, we concluded in *Dorais* that the defendants had failed to establish a reasonable expectation of privacy in the hotel room at the time of the search at around 12:40 p.m. *Dorais*, 241 F.3d at 1130. We found that the hotel had clearly communicated the noon checkout time to the defendant because it was posted in the room and the hotel, following its standard procedure, reminded the defendant of the checkout time earlier that day. *Id.* We acknowledged that although it was not normal hotel policy to issue trespass notices to overstaying guests immediately at noon, we found that the defendant was put on notice that any extension past noon would be of limited duration. *Id.* As was customary, the defendant was asked by housekeeping around noon when he would be leaving. *Id.* These facts, along with the fact that the defendant's co-occupant had already left the room, and the defendant's testimony that he had planned to remain in the room until 12:30, established that the defendant's expectation of privacy in the room did not extend past 12:30. *Id.*

## B. Application to Case

At the outset, we reject Yang's argument that the above-mentioned cases are inapposite because they regard an expectation of privacy in property or premises rather than an expectation of privacy on the whole of one's movements that is at issue in this case. We are simply unwilling to conclude that a person has a reasonable expectation of privacy in his

movements as revealed by the historical location data of a rental vehicle after failing to return the vehicle by the contract due date, when there is no policy or practice of the rental company "permitting lessees to keep cars and simply charging them for the extra time." *See Dorias*, 241 F.3d at 1128 (citing *Henderson*, 241 F.3d at 647).

In this case, the rental contract provided that vehicles not returned by the due date will be reported as stolen to the proper authorities. Yang contends that Prestige Motors' decision not to immediately file a stolen vehicle report after the rental contract expired is evidence that the company does not strictly follow this policy. However, unlike in the cases discussed above, Yang presented no evidence at the suppression hearing of any other custom or practice by Prestige that led him to believe that rather than adhering to the rental contract terms and reporting the vehicle as stolen, Prestige would, absent any request by him, simply extend the lease term and charge him the additional fees. While the rental agreement provided that "[a] charge of $20.00 per day will be applied to the rental for every day the vehicle is late," the contract also provided that "[i]f a customer wishes to extend, he or she must notify the company 1 day in advance to make arrangements and additional payments." There is no evidence in the record to suggest that Yang notified Prestige of any intent on his part to extend the rental period. In addition, the rental contract warned lessees that Prestige may repossess a vehicle if not returned by the contract due date and that a $250.00 repossession fee will apply.

And in case there were any lingering doubts about whether Yang had a reasonable expectation of privacy in the location of the Yukon at the time Inspector Steele searched the LEARN database on April 13, 2006, we conclude that Prestige's private attempts to repossess the Yukon by

activating the GPS and disabling the vehicle placed Yang, the sole authorized driver, on notice that Prestige did not intend to extend the lease term, but rather sought to repossess the vehicle.

At oral argument, Yang also argued that he had standing to object to the query of the LEARN database because it revealed his location on April 5, 2016, at approximately 11:24 p.m., at which time, he alleges, he still had a reasonable expectation of privacy in his movements. Given the rental agreement provided that vehicles not returned by the "due date" would be reported as stolen, Yang contends that he had a reasonable expectation of privacy in his movements, as revealed by the location data of the Yukon until 11:59 p.m. on April 5th even though the vehicle was due back by 10:48 a.m. that day. Because the ALPR camera captured the Yukon's location information well after the close of Prestige's business hours, as clearly advertised on the rental agreement, we need not determine whether a defendant has standing to object to a "search" of a rental vehicle's historical location information that was captured and uploaded to a database prior to the expiration of the rental agreement.

**AFFIRMED**.

---

BEA, Circuit Judge, concurring in the judgment:

I agree with the majority that Yang's Fourth Amendment rights were not violated by the search of the LEARN database. But I disagree with the majority's holding that because Yang's lease on the Yukon had expired when its license plate was photographed by the automatic license plate reader ("ALPR"), he has not alleged a violation of his

reasonable expectation of privacy and therefore lacks standing to challenge the warrantless search of the LEARN database. *Cf. United States v. SDI Future Health, Inc.*, 568 F.3d 684, 695 (9th Cir. 2009) (describing "Fourth Amendment standing"). I would affirm the district court but do so on the grounds that the search of the LEARN database did not require a warrant because the information in the database did not reveal "the whole of [Yang's] physical movements," and therefore did not infringe on that reasonable expectation of privacy. *Carpenter v. United States*, 138 S. Ct. 2206, 2219 (2018).

# I

In *Carpenter* the Supreme Court confirmed what its prior cases had implied: in the United States, "individuals have a reasonable expectation of privacy in the whole of their physical movements." 138 S. Ct. at 2217. Therefore, the Court found, government access to privately held cell phone location records, which contained more than 100 entries per day showing where the defendant was located at a specific time, infringed upon the expectation of privacy in the whole of one's physical movements and required a search warrant supported by probable cause. *Id.* at 2221. Yang's argument is that just as the cell phone records in *Carpenter* revealed "the whole of [the defendant's] physical movements" and allowed the government to achieve "near perfect surveillance, as if it had attached an ankle monitor to the phone's user," the LEARN database provided the government here with the same degree of information and thus required a warrant to access it. *Id.* at 2217–18. This claim falls apart under the barest of scrutiny.

The evidence in the record that relates to the question whether the information contained in the LEARN database revealed the whole of Yang's physical movements is this:

The President of Vigilant Solutions (which operates the LEARN database), Mike Hodnett, testified at the suppression hearing in January 2017 that the LEARN database contained approximately 5 billion vehicle location entries across the United States. He also testified that the database contained, on average, four unique entries annually for vehicles that had been identified by an ALPR. Specifically, in this case, the GMC Yukon that ultimately led investigators to Yang had been observed only once[1] by ALPRs that uploaded location information to the LEARN database, despite having been driven more than 105,000 miles.

Beyond the record from the district court, *amici* call our attention to the increasing ubiquity of ALPRs. *Amici* note promotional materials by Vigilant Solutions that state its commercial license plate database, which is a component of the LEARN database, currently contains 6.5 billion entries. Digital Recognition Network, https://drndata.com/ (noting "6,500,000,000 total vehicle sightings") (last visited March 12, 2020). This could mean that the LEARN database now contains upwards of 10 billion entries, since the district court found the LEARN database receives 65% of its total entries from the commercial database.[2] *Amici* also note that individual police departments maintain separate databases of information taken from ALPRs that contain millions of additional entries and are growing rapidly. The point *amici* make is that ALPRs are becoming more and more common

---

[1] The database contained two entries for the Yukon that were captured at the same location and one second apart, but these two entries represented only a single observation of the vehicle.

[2] Hodnett estimated that the commercial database accounts for 65% to 90% of the data in the LEARN database.

and therefore capturing more and more data, which when aggregated, may be able to reveal the whole of one's physical movements.

Looking at the specifics of this case, it's clear that the LEARN database did not contain information that revealed the whole of Yang's physical movements. Despite its 5 billion total records, the LEARN database contained a single entry for the Yukon that Yang had rented. Yang was unlucky that the one observation was recorded when he was in possession of the vehicle and was made near his residence. But even accepting that the search of the LEARN database revealed where Yang lived, it exposed nothing else about his "particular movements" whatsoever. *Carpenter*, 136 S. Ct. at 2217. Pointedly, the database search did not even directly place Yang near the mailboxes he pilfered, in contrast to the phone records which showed Carpenter in the areas of his crimes. The government learned no information about Yang's "familial, political, professional, religious, and sexual associations," when it ran the search for the Yukon's license plate. *Id.* (quoting *United States v. Jones*, 565 U.S. 400, 415 (Sotomayor, J., concurring)). Contrasted with the nearly 13,000 unique data points—more than 100 per day— that the search of cell phone records in *Carpenter* revealed, it's not hard to see how that search infringed on Fourth Amendment rights while the search here did not.

I understand that ALPRs *may* in time present many of the same issues the Supreme Court highlighted in *Carpenter*. ALPRs can effortlessly, and automatically, create voluminous databases of vehicle location information. If enough data is collected and aggregated, this could have the ability to identify quickly and easily the precise whereabouts and lifestyle habits of those whose vehicle information is recorded. ALPRs also collect information without

individualized suspicion, and records can be maintained for years. In retrospective searches, detailed and potentially private information may be exposed, though it is debatable whether license plate location data would ever provide the same "near perfect surveillance" that cell phone location data does. *See Carpenter*, 138 S. Ct. at 2218.

When applying the Fourth Amendment to emerging technologies, the Supreme Court has stated that we "must take account of more sophisticated systems that are already in use or in development." *Id.* (quoting *Kyllo v. United States*, 533 U.S. 27, 36 (2001)). *Amici* argue that this principle directs a holding that a government search of an ALPR database requires a warrant currently based on the future risk of a violation of a reasonable expectation of privacy if the technology advances as they believe it will. But both *Carpenter* and *Kyllo* made that statement in decisions that established new rules for government actions that constituted a "search" under the Fourth Amendment. Here, Yang asks us to apply *Carpenter* to the search of the LEARN database. It's clear to me that the database search did not reveal the whole, or even any, of Yang's physical movements. It would be folly to hold that searches of ALPR databases require a warrant without identifying even one case where the "whole of [one's] physical movements" was implicated in an ALPR database search. *Id.* at 2217. If the technology evolves in the way that *amici* hypothesize, then perhaps in the future a warrant may be required for the government to access the LEARN database, but this should only be the case if the database evolves to provide comparable location information to the records at issue in *Carpenter*.

**II**

As noted, the majority avoids addressing whether a search of the LEARN database, or other ALPR databases, requires a warrant because it finds that Yang lacked a reasonable expectation of privacy in the Yukon when the photograph of its license plate was taken by an ALPR and the location data uploaded to the LEARN database. In effect the majority holds that Yang lacked Fourth Amendment standing to challenge an illegal search of the Yukon at the moment the ALPR captured his license plate, and therefore he lacked a reasonable expectation of privacy in any location data revealed by searching the LEARN database. Setting aside the question whether the majority is correct in its analysis that Yang would not have had standing to challenge the physical search of a rental vehicle that was 13 hours overdue, I believe the majority is incorrect to resolve the case on this ground.

The cases the majority cites for its holding on Fourth Amendment standing did not involve alleged violations of the reasonable expectation of privacy in the whole of one's physical movements, and for this reason, I find their utility here lacking. I do not see how whether Yang had a valid possessory right in the Yukon when the ALPR photographed its license plate affects whether Yang may challenge the search of a database he alleges revealed the whole of his physical movements. *Cf. Jones*, 565 U.S. at 425 (Alito, J., concurring in judgment) (criticizing a holding that required the defendant to have "had at least the property rights of a bailee" in order to allege a Fourth Amendment violation for warrantless GPS tracking of a vehicle (quoting *id.* at 404 n.2)). In *Carpenter*, the Supreme Court was clear that the relevant inquiry, at least where location data is concerned, is what personal location information is revealed by a search

of the records, not what type of data was collected and under what circumstances. *See* 138 S. Ct. at 2219–20.

Yang challenges not the photographing of the Yukon's license plate but the search of the database that he believes revealed the whole of his physical movements. Yang is wrong on the merits of his claim, but he has standing to bring it. Accordingly, I concur in the judgment affirming the district court's denial of Yang's motion to suppress evidence.