IN THE

# ARIZONA COURT OF APPEALS
### DIVISION ONE

---

STATE OF ARIZONA, *Appellee*,

*v.*

JOHN JOSEPH SIDOR, *Appellant*.

No. 1 CA-CR 22-0387

FILED 10-17-2024

---

Appeal from the Superior Court in Mohave County
No. S8015CR202100051
The Honorable Derek C. Carlisle, Judge

**AFFIRMED**

---

COUNSEL

Arizona Attorney General's Office, Tucson
By Jacob R. Lines
*Counsel for Appellee*

Law Office of Shawn B. Hamp, Kingman
By Virginia L. Crews
*Counsel for Appellant*

---

**OPINION**

---

Judge Andrew M. Jacobs delivered the decision of the Court, in which Chief Judge David B. Gass joined. Presiding Judge Michael J. Brown dissented.

---

**J A C O B S**, Judge:

¶1 John Joseph Sidor was convicted of transporting narcotic and dangerous drugs for sale after a Department of Public Safety (DPS) officer found cocaine and methamphetamine in his car during a traffic stop. On December 31, 2020, the officer stopped Sidor after using DEASIL[1], the United States Drug Enforcement Agency's database of pictures of license plates captured in travel, to obtain travel history data for the car Sidor was driving. The officer obtained the data by certifying to the DEA (so he could access DEASIL) that he had a reasonable articulable suspicion that the car Sidor was driving had been involved in "narcotics trafficking or bulk cash smuggling" before stopping Sidor. The officer used DEASIL data showing the car Sidor was driving had come through Kingman on October 30, 2020 and November 30, 2020 to justify detaining him on December 31 until a drug-detecting DPS K-9 arrived and alerted to drugs in the car. Sidor moved unsuccessfully to suppress the drugs.

¶2 Sidor appeals the superior court's decision not to suppress, arguing: (1) he was detained beyond the scope of the traffic stop without reasonable suspicion of criminal activity; (2) the officer's use of DEASIL was a limited search requiring reasonable suspicion, which the officer lacked; and (3) the alert by Turbo, the DPS K-9 who sniffed Sidor's vehicle, did not establish probable cause for the search. We hold: (1) there were insufficient grounds to detain Sidor without the DEASIL information; (2) Sidor's argument to exclude the DEASIL data fails because he lacked a reasonable expectation of privacy in data concerning other drivers on other trips; and (3) Turbo's alert gave DPS probable cause to search Sidor's car. We thus affirm Sidor's convictions.

---

[1] DEASIL stands for Drug Enforcement Agency Special Intelligence Link.

## FACTS AND PROCEDURAL HISTORY

### A. A DPS Officer Accesses DEASIL and Pulls Over Sidor After Learning the Nissan He Was Driving Appeared to Be Involved in a Distinct Pattern of Travel Through Arizona.

¶3 On December 31, 2020, a DPS officer was monitoring eastbound traffic from the median on Interstate 40, near Lake Havasu City, Arizona, in a marked law enforcement vehicle when Sidor drove past him in a Nissan Rogue "staring straight ahead" at the highway with "his hands at the 10 and 2 position." The officer later testified he was suspicious Sidor was involved in drug trafficking because he found Sidor's posture and hand position atypical of drivers as they passed him, and because Sidor, unlike the "innocent motoring public," did not "wav[e]" but instead "ignor[ed him] like [he was not] even sitting there or not even existing."

¶4 The officer pulled onto the Interstate and followed Sidor for four miles. At that point, the officer saw Sidor commit a moving violation, as he followed a semitrailer truck too close. The officer timed Sidor traveling 1.19 seconds behind a semi truck in a 75-mile-per-hour zone.

¶5 After the officer had seen a moving violation that would allow him to stop the car, he "saw it had the Minnesota plate." The officer drove up behind Sidor's car to get a clear view of the Minnesota license plate so he could type the license plate information into DEASIL, which he was already logged into in anticipation of running searches while he drove.

¶6 To get access to plate information under DEASIL, the officer first represented to the DEA that he had a "[r]easonable [a]rticulable [s]uspicion [of criminal activity] to support a [license plate] query." DEASIL employs this Fourth Amendment verbiage as a prerequisite to running queries with its data.

¶7 The officer had to make a second representation before DEASIL would return information about Sidor's vehicle's Minnesota plate. The second representation was of what specific criminal activity the officer had a "reasonable articulable suspicion." The officer represented that he had a reasonable articulable suspicion that Sidor's vehicle was "associated with narcotics trafficking or bulk cash smuggling." The officer always chooses this representation to obtain DEASIL data, because "that's what [he's] doing as criminal interdiction, looking for drug smuggling and terrorists, and money laundering or bulk cash."

¶8          As he drove behind Sidor, the officer waited for the information from DEASIL before initiating the traffic stop. His DEASIL query showed the Nissan had traveled (1) westbound through Seligman at 3:56 a.m. on October 30, 2020, (2) eastbound through Kingman at 7:56 a.m. on October 31, 2020, (3) eastbound through Kingman on November 30, 2020, and (4) westbound through Kansas on December 29, 2020. The officer then pulled Sidor over at about 5:22 p.m. on December 31, 2020.

### B.      The Officer Questioned Sidor About His Trip and Other Trips the Car May Have Taken to California.

¶9          Video captured the stop. The officer told Sidor he was following a semi too closely and that he would issue Sidor a warning, no ticket, then "get you out of here."

¶10          At the officer's request, Sidor produced his North Dakota driver license and the Nissan's insurance and registration information. Sidor got out of the car while the officer conducted a records check, and the officer began asking him questions. Sidor said he was a restaurant server who had traveled to Los Angeles, staying just one night, to pick up a bulldog puppy he had purchased. The officer questioned Sidor's claimed purchase price of $500, and asked Sidor if he knew what they normally go for, to which Sidor answered "fifteen [hundred]." Sidor explained he had the trip planned for about a month because the puppy was now six weeks old.

¶11          Sidor said he borrowed the Nissan from his friend Jason, who lived in Minnesota, because his own "car doesn't run the best." When the officer asked Sidor about "Christopher"—the name on the registration—Sidor said Jason had borrowed the vehicle from Christopher.

¶12          Sidor said this was his first time driving the Nissan and he had not been to California in a few years. The officer asked Sidor whether everything in the Nissan "belonged to [him]," and Sidor indicated that was true as far as he knew. A little later, Sidor volunteered the luggage in the vehicle was his but other items might not be. When the officer asked if anyone had placed anything in the Nissan in California that did not belong to him, he said no.

¶13          The officer asked Sidor why he was "so nervous," while Sidor responded that he wasn't nervous. The officer then asked Sidor to expose his neck by removing his Covid-era gaiter, which Sidor did. The officer said he could see Sidor's carotid artery pulsing when Sidor did so, although the video does not corroborate that. The officer asked Sidor to confirm where

he lived, his hair color, height, and body weight. The officer learned that Sidor stayed at a Doubletree in California, had never driven the car before this trip, and that the trip takes a little more than 24 hours. The officer later testified that Sidor appeared to him to grow more nervous to the officer during their interaction. Sidor spoke in a calm, low tone during the interview, and is conversational and responsive to the officer.

¶14 About 10 minutes after pulling Sidor over, the officer returned his license and other documents to him. The officer then asked Sidor "how often" Jason went to California in the Nissan, and Sidor said he did not "know if he ever has." The officer asked if Chris has, and Sidor responded, "I don't even know him." The officer issued the warning.

### C. Based on the DEASIL Information and His Interview of Sidor, the Officer Detained Sidor Until a Drug-Sniffing K-9 Arrived and Alerted, Leading to the Discovery of Drugs.

¶15 Right after handing Sidor the warning, the officer said there was "a big problem with criminal activity on Interstate 40" and asked Sidor if there was "anything illegal" in the Nissan such as drugs, large amounts of money, or weapons. Sidor answered "no." The officer asked if he could search the vehicle or if Sidor would wait for a K-9 to sniff the exterior—both of which Sidor declined. The officer then told Sidor to "hang tight," and he called for a K-9 officer and dog.

¶16 When Sidor asked how long it would take, the officer told him the K-9 officer was off duty and would need to get dressed and drive over. While they waited, the officer repeatedly told Sidor he was "not free to leave" and the officer refused Sidor's request to call an attorney due to safety concerns with Sidor using his phone—which was still in the Nissan. The officer told Sidor he believed "there [was] large drug smuggling occurring," explaining "there[] [were] just a lot of indicators" of drug trafficking.

¶17 The K-9 officer lived 33 to 36 miles away from the location of the traffic stop, and it took him about 45 minutes to arrive with the drug sniffing dog named Turbo. Turbo was certified to detect odors of methamphetamine, cocaine, and heroin. Turbo alerted near the driver's side door, in the lower part of the Nissan. The officer then handcuffed Sidor and found a glass pipe and a white crystalline substance resembling methamphetamine in his pockets. Both officers searched the vehicle, where they discovered a hidden compartment below the floorboard that contained plastic-wrapped bundles. The vehicle was towed to the highway patrol

office where a full search, and subsequent testing, revealed 13 bundles of cocaine totaling 32.5 pounds and an additional one-pound bundle of methamphetamine.

### D. Sidor Was Convicted After Unsuccessfully Moving to Suppress the Drugs, Arguing His Stop Was Unreasonably Prolonged, the Officer Lacked Probable Cause, and Turbo Was Unreliable.

¶18 Relevant here, the State charged Sidor with transportation of narcotic drugs for sale, a class 2 felony, and transportation of dangerous drugs (methamphetamine) for sale, a class 2 felony.[2] Sidor moved to suppress the drug evidence before trial challenging the constitutionality of both the investigative stop and vehicle search. *See* U.S. Const. amends. IV, XIV; Ariz. Const. art. 2, § 8; Ariz. R. Crim. P. 16.2. He argued that the officer lacked reasonable suspicion to stop him for a traffic violation, the officer unreasonably prolonged the stop, and Turbo's alert was not sufficiently reliable to provide probable cause for searching the vehicle.

¶19 The superior court denied Sidor's motion after an evidentiary hearing. The court first determined the officer lawfully stopped Sidor for following too closely and that the time from the stop to issuance of the warning was not unreasonably prolonged. The court found reasonable suspicion for the officer to detain Sidor for the dog sniff. The court also found that the duration of the detention for the dog sniff was reasonable and that Turbo's alert was reliable based on certification and training records.

¶20 After the court ruled on Sidor's motion, Sidor sought and obtained additional discovery on DPS policies and procedures for using the DEASIL database. Sidor then filed another motion to suppress the drug evidence on the ground that the officer's use of DEASIL was unlawful under the federal and Arizona constitutions. *See* U.S. Const. amends. IV, XIV; Ariz. Const. art. 2, § 8; Ariz. R. Crim. P. 16.2. Based on the briefing and without an evidentiary hearing, the superior court denied the motion, reasoning that Sidor did not show good cause to reconsider its prior decision and that Sidor's arguments failed on the merits in any event because the officer's use of DEASIL was not a Fourth Amendment "search"

---

[2] The State also charged Sidor with possession of drug paraphernalia, a class 6 felony. The court dismissed that charge on the first day of trial at the State's request.

and the officer's noncompliance with DEA requirements for using the database did not require suppression.

¶21 A jury convicted Sidor of transportation of narcotic drugs for sale and transportation of dangerous drugs for sale (methamphetamine) and. Given his prior criminal history, the superior court sentenced Sidor as a category 2 repetitive offender to concurrent prison terms, the longest of which was for 10 years' imprisonment. We have jurisdiction over Sidor's appeal under Article VI, Section 9 of the Arizona Constitution and A.R.S. §§ 12-120.21(A)(1), 13-4031, and 13-4033(A).

## DISCUSSION

¶22 Sidor argues that the drug evidence should have been suppressed because: (1) the officer unlawfully detained him beyond the time required to issue the warning; (2) the officer's use of DEASIL was unlawful; and (3) Turbo's alert did not supply probable cause to search the vehicle.

¶23 We review the superior court's factual findings on the motion to suppress for an abuse of discretion, *State v. Jean*, 243 Ariz. 331, 334 ¶ 9 (2018), and view the facts of the suppression hearing in the light most favorable to sustaining the superior court's ruling. *Id.* at 333 ¶ 2. We review whether reasonable suspicion exists *de novo*, because it is a mixed question of fact and law. *State v. Majalca*, 251 Ariz. 325, 328 ¶ 11 (2021).

I. **The Officer Only Had Probable Cause to Detain Sidor After Citing Him for His Moving Violation if the DEASIL Data Were Not Obtained in Violation of the Federal and Arizona Constitutions.**

    A. **The Officer Reasonably Detained Sidor from the Time of the Moving Violation Through Issuing the Warning and Returning the Nissan's Insurance and Registration to Sidor.**

¶24 Sidor concedes the moving violation justified the traffic stop. Warrantless traffic stops are permitted if the officer has reasonable suspicion that the driver committed a traffic violation. *State v. Evans*, 237 Ariz. 231, 233 ¶ 1 (2015).

¶25 Instead, Sidor questions the length of his detention as a result of the traffic stop. Police may "inquir[e] into matters unrelated to the justification for the traffic stop . . . so long as those inquiries do not measurably extend the duration of the stop." *Arizona v. Johnson*, 555 U.S. 323, 333 (2009); *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) ("An

officer . . . may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual.")

¶26        About 11 minutes elapsed from the time the officer pulled Sidor over to when he issued the warning. The officer testified that such amount of time was typical for conducting a records check and issuing a warning. The record supports the superior court's ruling that this initial detention of Sidor was not unreasonably prolonged by the officer's inquiries into matters unrelated to the traffic violation. No evidence was presented that the officer completed, or reasonably could have completed, "tasks tied to the traffic infraction" sooner had he not made those unrelated inquiries. *Rodriguez*, 575 U.S. at 354. The detention through the issuance of the warning was thus proper.

> **B.     The DEASIL Data Showing the Distinctive Pattern in the Car's Travels and the Fact That Sidor Was Driving a Borrowed Car Whose Owner He Did Not Know Created Reasonable Suspicion for Sidor's Continued Detention.**

¶27        The officer was only permitted to detain Sidor involuntarily until Turbo sniffed the Nissan if he had a reasonable suspicion of criminal activity. *See State v. Sweeney*, 224 Ariz. 107, 112, ¶ 17 (App. 2010). "By definition, reasonable suspicion is something short of probable cause." *Majalca*, 251 Ariz. at 330 ¶ 20 (2021). "Although 'reasonable suspicion' must be more than an inchoate 'hunch,' the Fourth Amendment only requires that police articulate some minimal, objective justification for an investigatory detention." *State v. Teagle*, 217 Ariz. 17, 23 ¶ 25 (App. 2007). Reasonable suspicion exists where "'the totality of the circumstances—the whole picture' of what occurred at the scene" provides a law enforcement officer with "'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Evans*, 237 Ariz. at 234 ¶ 8 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981)). The determination of reasonable suspicion "is dependent upon both the content of information possessed by police and its degree of reliability." *Alabama v. White*, 496 U.S. 325, 330 (1990).

¶28        We agree with our dissenting colleague that Sidor's behavior up through the issuance of the citation did not justify continuing to detain him. The superior court properly rejected the officer's observations that Sidor was suspicious because his hands were at 10 and 2 on the steering wheel, observing that the judge himself was taught to drive that way in

school. Looking "straight ahead" as one passes a law enforcement vehicle is likewise not a reliable indicator of criminal activity. *See State v. Maldonado*, 164 Ariz. 471, 473–74 (App. 1990) (citing cases in which little weight was given to evidence that a driver was "sitting erectly" or "rigidly" and did not look at a patrol car). The court was properly cautious about giving too much weight to evidence of Sidor's nervousness, as the video evidence does not show the "overly nervous" behavior to which the officer testified. *See State v. Magner*, 191 Ariz. 392, 397–98 ¶¶ 14–15 (App. 1998) (cautioning courts to "be wary of granting much weight to a law enforcement officer's subjective observation that a defendant was nervous" absent "'dramatic' indications of nervousness" that "both objectify and quantify the nervousness exhibited") (overruled in part on another ground, *State v. O'Meara*, 198 Ariz. 294 (2000)). Finally, the officer acknowledged at the evidentiary hearing that the records check disclosed nothing amiss about Sidor or the Nissan and that Sidor's answers to his questions revealed no inconsistencies with other information provided by Sidor or otherwise known to the officer.

¶29        Our analysis of the superior court's conclusion that there was reasonable suspicion for the officer to detain Sidor for the dog sniff thus rests on the officer's use of the DEASIL data, and the fact that Sidor was driving a borrowed Nissan across the country, a Nissan Sidor borrowed from someone other than the owner. The DEASIL data showed the Nissan made two trips through Kingman (first westbound and then eastbound) two months earlier. Then the next month, the Nissan again was traveling eastbound through Kingman. Both trips may have involved the Nissan going to and coming from California. Then a few days before Sidor's arrest, the Nissan traveled westbound through Kansas, which was consistent with Sidor's explanation of his trip to and from California. At bottom, Sidor's trip was the third time in three months, at precise one-month intervals, at which the Nissan went through Kingman at the end of a month. By Sidor's own explanation, he had been to and from California on that third trip. Even on a de novo review, that evidence supports the superior court's finding the officer reasonably could conclude Sidor might have been engaged in drug trafficking.

¶30        The suggestive force of these facts is where we differ with the dissent. We agree with the dissent that "[r]easonable suspicion cannot rest solely on 'circumstances or factors that do not reliably distinguish between suspect and innocent behaviors . . . because they may cast too wide a net and subject all travelers to 'virtually random seizures.'" *Sweeney*, 224 Ariz. at ¶ 22. The DEASIL data strongly suggest that Sidor's travel to Los Angeles formed a pattern with trips others took in the same Minnesota-

plated car from the upper Midwest through western Arizona, to southern California and back on each of October 30, November 30, and December 31. We agree with the superior court's choice to credit law enforcement's inference that this highly distinctive pattern of travel is distinguishable from "innocent behaviors." We thus disagree that crediting that inference subjects the public to "virtually random seizures." *See id.*

¶31 One of our recent memorandum decisions illustrates the difference between facts that give rise to reasonable suspicion in a traffic stop, as here, and those that do not. *State v. Kochendarfer*, No. 1 CA-CR 20-0364, 2021 WL 3674160 (Ariz. App. Aug. 19, 2021) (mem. decision). In *Kochendarfer*, another driver of a car with out-of-state plates passing through western Arizona was pulled over on Interstate 40 for following another large vehicle too closely. *Id.* at *1 ¶ 2. While those facts match Sidor's case perfectly, the rest do not. That driver was driving repetitively between California and Texas because he was "in the process of moving from California to Texas and had made multiple trips in the last several months," a common and mundane activity. *Id.* at *1 ¶ 3.

¶32 There is also no indication in *Kochendarfer* that the driver borrowed the car, or didn't know its owner, as was true here, heightening suspicion. *See United States v. Pettit*, 785 F.3d 1374, 1382 (10th Cir. 2015) ("In the trooper's professional experience, and in our case law, driving a vehicle registered to an absent third party can indicate drug trafficking."). Sidor, by contrast, drove a borrowed car cross-country without knowing its owner. *See id.* Despite claiming he had just bought a bulldog puppy in southern California, Sidor when pulled over was reprising a quick turnaround trip that others drove before him in the same car between Minnesota and southern California. *See United States v. Eymann*, 962 F.3d 273, 282 (7th Cir. 2020) (affirming denial of motion to suppress, holding pattern of quick turn-around flights between California and Pennsylvania supported inference that criminal activity was afoot: "[s]uch quick-turn flights, although not necessarily illegal, may contribute to reasonable suspicion of criminal conduct."). Moreover, those three trips fell in a highly regular pattern implying a common purpose: on October 30, November 30, and December 31. All of this supports crediting law enforcement's suspicion that criminal activity was afoot. *See id.*

¶33 Given the facts and case law, the superior court did not err by denying Sidor's motion to suppress. We agree with the superior court that the record, in particular the DEASIL data and the fact that Sidor borrowed the car, created reasonable suspicion to detain Sidor for the dog sniff. The question then becomes whether the State was entitled to rely on the DEASIL

data as a basis to search Sidor's vehicle, or whether any reliance on it is improper, as Sidor argues.

**II.     The State Had the Right to Search the Car Sidor Was Driving Based in Part on the DEASIL Data, Because They Primarily Concerned the Movements of Others, in Which He Had No Reasonable Expectation of Privacy.**

¶34     Sidor argues the officer's use of DEASIL requires suppression because: (1) the database infringed privacy interests protected by the Fourth Amendment; (2) even if use of the database did not constitute a "full search" requiring a warrant supported by probable cause, it was at minimum a "limited search" requiring reasonable suspicion; and (3) the officer lacked reasonable suspicion before using DEASIL and falsely attested to having it in violation of DEA requirements.

¶35     The State responds that the officer's use of DEASIL did not infringe Sidor's Fourth Amendment rights because: (1) he had no reasonable expectation of privacy in the Nissan's license plate or its movements on public roads; (2) the information captured by the automated license plate readers (ALPRs[3]) that fed into DEASIL was minimal and did not constitute a trespass; and (3) the officer's alleged misuse of the database did not require suppression.  As explained next, we agree with the State's position, given the particular facts of this case.

### A.     The Limited Use of DEASIL Data Here Did Not Infringe on Sidor's Reasonable Expectation of Privacy.

¶36     We reject Sidor's argument that the State's use of DEASIL information here violated the Fourth Amendment because it was like the cell site location information (CSLI) in *Carpenter v. United States*, 585 U.S. 296 (2018).  *Carpenter* involved the "tireless and absolute surveillance" a cell phone's location enables whenever it makes or receives a call.  *Id.* at 305,

---

[3]     ALPRs are "high-speed cameras that photograph each license plate that passes by the devices," which "can image about 2,000 license plates per minute," at any time of the day, and which "can be placed anywhere from police vehicles to stationary objects like poles, traffic lights, and overpasses."  Samuel D. Hodge, Jr., *Big Brother Is Watching: Law Enforcement's Use of Digital Technology in the Twenty-First Century*, 89 Univ. Cin. L. Rev. 30, 38 (2020).  Images captured by ALPRs "are transmitted and analyzed by a computer that identifies the owner of the vehicle, affixes a time and location stamp, and uploads the images to a central server."  *Id.*

312. The Supreme Court held in *Carpenter* that "an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI." *Id.* at 310. The Court found the use of CSLI to be a search under the Fourth Amendment requiring a warrant because of the "all-encompassing record of the holder's whereabouts" it afforded. *Id.* at 311.

¶37 Here, the DEASIL database information concerning Sidor was entirely the opposite. It consisted of one picture of the Nissan's license plate, taken as Sidor traveled west through Kansas toward California the day before he was stopped near Kingman on his return. *Carpenter* made clear that one has "a reasonable expectation of privacy in the whole of their physical movements." 585 U.S. at 310 (citing *United States v. Jones,* 565 U.S. 400, 430 (2012) (Alito, J., concurring)); *id.* at 415 (Sotomayor, J., concurring). But the officer only accessed a single picture of the Nissan's license plate while Sidor drove it, which is hardly "the whole of [Sidor's] physical movements." *See id.* We thus agree with the Massachusetts Supreme Judicial Court's statement in *Commonwealth v. McCarthy* that while the right to privacy from comprehensive surveillance "could be implicated by the widespread use of ALPRs, that interest is not invaded by the limited extent and use of ALPR data in this case." 142 N.E.3d 1090, 1095, 1106 (Mass. 2020) ("While we cannot say precisely how detailed a picture of the defendant's movements must be revealed to invoke constitutional protections, it is not that produced by four cameras at fixed locations on the ends of two bridges.").

¶38 Sidor lacked a reasonable expectation of privacy in the DEASIL data that justified detaining him for Turbo's sniff of the Nissan because those data principally concerned other drivers of the Nissan on other trips. DEASIL revealed two trips the Nissan had taken through Arizona on October 30 and November 30, 2020, seemingly consistent with Sidor's own. But Sidor did not own the Nissan, and did not participate in those trips. He thus lacked a reasonable expectation of privacy in those other travelers' locational data. *See, e.g., United States v. Beaudion*, 979 F.3d 1092, 1100 (5th Cir. 2020) (holding that defendant lacked a "reasonable expectation of privacy in a [CSLI] record that reveals someone else's location"). Arizona law likewise makes clear that Sidor cannot assert a right to privacy in the Nissan's travel for its absent owners or prior drivers. *See State v. Juarez*, 203 Ariz. 441, 444, 447 ¶¶ 13, 24 (App. 2002) (interpreting Article 2, Section 8 of the Arizona Constitution as "imply[ing] that a person must show that *his* or *her* personal privacy rights were infringed before attacking the legality of a search or seizure" and holding that neither that provision nor Arizona case law confers "automatic standing to challenge a

search and seizure in which someone else's rights may have been violated.").

¶39  Sidor makes an excellent point – the use of ALPR data may soon be so widespread as to risk offering government the very comprehensive surveillance decried in *Carpenter* and against which the Fourth Amendment stands. *See, e.g., United States v. Tuggle*, 4 F.4th 505, 509 (7th Cir. 2021) ("[W]e are steadily approaching a future with a constellation of ubiquitous public and private cameras accessible to the government that catalog the movement and activities of all Americans."); *United States v. Yang*, 958 F.3d 851, 863, 864 (9th Cir. 2020) (Bea, J., concurring) (discussing ALPR database containing over 10 billion images and stating, "[i]f the technology evolves in the way amici hypothesize, then perhaps in the future a warrant may be required for the government to access the LEARN database [of ALPR data], but this should only be the case if the database evolves to provide comparable location information to the records in *Carpenter*.").

¶40  But his point founders because this record contains little information about DEASIL's scope. No evidence was offered, for example, of how many ALPRs feed into DEASIL or where they are located. This case did not suggest that ALPRs are rife along the interstate highway system, because Sidor's December 2020 cross-country drive of more than 24 hours triggered the generation of only one ALPR image contained in the record. That ALPRs can generate privacy concerns akin to those in *Carpenter* awaits a bleaker future and a case with a more developed record.

  **B.**  **While ALPRs Implicate Privacy Concerns, on the Record Presented, Their Use Was Not a Limited Search Under the Fourth Amendment.**

¶41  Sidor's objections that the use of ALPRs was a limited search under the Fourth Amendment and that the officer's false certification of a reasonable articulable suspicion of drug trafficking before pulling him over fail because the mere use of ALPRs is not yet a search in American law – though in a more developed record, or a future more rife with cameras, it might well be a search.

¶42  While we do not know DEASIL's reach, its use affects privacy interests. The DEA – the proprietor of the database – makes this clear by requiring that an officer have "[r]easonable [a]rticulable [s]uspicion" of specific criminal activity in order to run a license plate query in the database. The phrase "reasonable articulable suspicion" comes directly

from interpretations of the Fourth Amendment. *See United States v. Place*, 462 U.S. 696, 702–03 (1983). The phrase has come to signify the objective, particularized showing required of police before they may conduct a limited invasion of a person's Fourth Amendment rights. *See Terry*, 392 U.S. at 20–22; *see also State v. Superior Court (Blake)*, 149 Ariz. 269, 273–74 (1986).

**¶43** State laws regulating the use of ALPRs illustrate a broadly-held belief that information captured by ALPRs and compiled in databases like DEASIL impact privacy interests. *See* Nat'l Conf. State Legislatures, State Statutes Related to Privacy and Data Retention, Automated License Plate Readers: State Statutes (Feb. 3, 2022), https://www.ncsl.org/technology-and-communication/automated-license-plate-readers-state-statutes (last visited Aug. 16, 2023) (summarizing laws in 17 states). Such laws limit ALPR use to specified purposes, prevent public disclosure of ALPR information, and impose destruction and reporting requirements. *See, e.g.*, Me. Rev. Stat. tit. 29-a, § 2117-A(3)(C), (4), (5) (2019) (allowing the use of ALPRs by law enforcement in crime prevention only if the officer has "specific and articulable facts of a concern for safety, wrongdoing or a criminal investigation or pursuant to a civil order or records from the National Crime Information Center database or an official published law enforcement bulletin" and requiring that such data be kept confidential and destroyed within 21 days under most circumstances); Minn. Stat. § 13.824(2)(d), (3), (5), (6) (2021) (prohibiting the use of ALPRs "to monitor or track an individual who is the subject of an active criminal investigation unless authorized by a warrant, issued upon probable cause, or exigent circumstances justify the use without obtaining a warrant" and imposing nondisclosure, destruction, and public reporting requirements); Neb. Rev. Stat. §§ 60-3203(2), 60-3204 (2018) (limiting law enforcement's use of ALPRs to identifying "[o]utstanding parking or traffic violations," "[a]n unregistered or uninsured vehicle," "[a] vehicle in violation of the vehicle equipment requirements," "[a] vehicle in violation of any other registration requirement," "[a] vehicle registered to an individual for whom there is an outstanding warrant," "[a] vehicle associated with a missing person," "[a] vehicle that has been reported as stolen," or "[a] vehicle that is relevant and material to an ongoing criminal investigation"; permitting manual queries only in cases of "an ongoing criminal or missing persons investigation"; and requiring officers to "document the reason" for any such manual query); West's Utah Code Ann. §§ 41-6a-2003(2)(a), 41-6a-2004 (West 2023) (permitting law enforcement use of ALPRs only "as part of an active criminal investigation," "to apprehend an individual with an outstanding warrant," "to locate a missing or endangered person," or "to locate a stolen vehicle," and imposing destruction and nondisclosure requirements).

¶44        While often recognizing the privacy issues ALPRs pose, courts considering the question have thus far uniformly held that the uses of ALPRs before them were not Fourth Amendment searches requiring warrants or probable cause.  *See McCarthy*, 142 N.E.3d 1090, 1106 (explaining it was not a search when defendant's vehicle was tracked by ALPRs on two Cape Cod bridges after police had reason to believe defendant was trafficking drugs in the area); *United States v. Rubin*, 556 F. Supp. 3d 1123, 1127-30 (N.D. Cal. 2021) (explaining ALPR database query run on license plate associated with robbery); *United States v. Graham*, Crim. No. 21-645 (WJM), 2022 WL 4132488 (D. N.J. Sept. 12, 2022) (same); *United States v. Porter*, No. 21-cr-00087, 2022 WL 124563 (N.D. Ill. Jan. 13, 2022) (same); *United States v. Brown*, No. 19 CR 949, 2021 WL 4963602 (N.D. Ill. Oct. 26, 2021) (same); *United States v. Bowers*, No. 2:18-CR-00292-DWA, 2021 WL 4775977, *1 (W.D. Pa. Oct. 11, 2021) (explaining that the ALPR database query run on defendant's license plate was "two days after the date of the offense"); *United States v. Toombs*, 671 F. Supp. 3d 1329, 1335 (N.D. Ala. 2023) (affirming a magistrate judge's recommendation to deny a suppression motion challenging the use of DEASIL, where there was reasonable suspicion to detain the defendant for a dog sniff regardless of the DEASIL search); *see also Yang*, 958 F.3d at 862–64 (Bea, J., concurring) (disagreeing with majority's decision that defendant lacked standing but finding no "search" where defendant's license was entered into an ALPR database after the vehicle was linked to a string of thefts).  This reinforces our conclusion that Sidor was not subjected to an unconstitutional search by the officer on the particular facts of this case, where the DEASIL query only resulted in a single snapshot of his car travel taken the day before, and where the relevant pattern in the DEASIL data consisted almost entirely of the movements of other persons.

¶45        No one should misread this case, or those others, as establishing a rule that using DEASIL cannot be a Fourth Amendment search.  For one thing, as DEASIL becomes more comprehensive, its reach backwards in time to map the activities of defendants will continue to improve, making it ever more CSLI-like.  *See, e.g., Yang*, 958 F.3d at 864 (Bea, J., concurring) (suggesting that when ALPRs become CSLI-like in their ability to track movements, the logic of *Carpenter* would apply to their use); *Tuggle*, 4 F.4th at 509 (warning of rise of ubiquitous camera surveillance and likely evolution of legal landscape in reaction to it).  For another, as the parentheticals in Paragraph 44 explain, all but one of the cases finding the ALPR data not to be a search involved ALPR data obtained *after* police had reason to believe that a particular vehicle was involved in a specific crime.  Those courts all reviewed uses of ALPR where the reasonable articulable suspicion to use the ALPR was a given.  Where, as here, an officer uses the

DEASIL database *to generate the facts necessary to constitute reasonable suspicion*, the database may elicit information providing a far more elaborate picture of travel in which the car-owner had a reasonable expectation of privacy, justifying suppression. Whether fortuitously or otherwise, this was simply not that case.

> **C.    The Record of This Case Does Not Allow Us To Conclude That the Officer's Certification to Obtain the DEASIL Data Compelled the Suppression of the Fruits of the Traffic Stop.**

**¶46**         We are troubled by the use of DEASIL based on an automatic certification of articulable reasonable suspicion in all cases. Yet while Sidor argues that the officer violated DEA's policies, those policies or guidelines are not part of this record, so we see no legal error in the superior court finding no violation. The United States Supreme Court has applied the exclusionary rule where "the excluded evidence arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348 (2006). Yet the briefing before us identifies no statutory violation. For these reasons, and those stated in Paragraphs 36 to 45, Sidor has not shown that the superior court misapplied the law in declining to exclude the ALPR data, consisting of one photograph of the Nissan with Sidor driving it, and other data concerning other drivers.

## III.    Turbo's Alert Was a Reliable Basis For Searching the Nissan.

**¶47**         We reject Sidor's claim that Turbo's alert was not sufficiently reliable to establish probable cause for searching the Nissan. As Sidor recognizes, "a well-trained dog's alert establishes a fair probability — all that is required for probable cause — that either drugs or evidence of a drug crime . . . will be found." *Florida v. Harris*, 568 U.S. 237, 246 n.2 (2013); *see also Teagle*, 217 Ariz. at 27 ¶ 36 n.7. Courts should apply a "flexible, all-things-considered approach" to determining a dog's reliability. *Harris*, 568 U.S. at 244.

**¶48**         The superior court did not abuse its discretion by finding Turbo's alert reliable based on his certification and training logs. Turbo was certified, about 12 weeks before he was deployed to sniff Sidor's vehicle, to detect heroin, cocaine, and methamphetamine. While certification required an 80 percent pass rate, Turbo's training logs between the date he was certified and when he sniffed the Nissan show 100 percent accuracy in alerting when those drugs were present and not alerting when they were

absent. The superior court's finding as to Turbo's reliability was well-supported.

¶49 Sidor's argument that potential errors in Turbo's field deployment render him unreliable is unavailing. The United States Supreme Court has explained that such episodes do not undermine a dog's reliability because they do not conclusively demonstrate mistakes. Turbo could have, for example, "detected substances that were too well hidden or present in quantities too small for the officer to locate." *Harris*, 568 U.S. at 245. Likewise, Turbo's inability to rule out residual odors does not negate the reliability of his alerts because "[a] detection dog recognizes an odor, not a drug," the dog "should alert whenever the scent is present, even if the substance is gone," and "[i]n the usual case, the mere chance that the substance might no longer be at the location" does not detract from a finding of probable cause based on the alert. *Id.* at 246 n.2. Finally, field deployment records have limited ability to show false negatives because searches are not typically done if a dog does not alert. *See id.* at 245. For all of these reasons, Turbo's performance in the field does not undermine his reliability.

## CONCLUSION

¶50 For the reasons stated, we affirm the superior court's denial of Sidor's motions to suppress, and thus, his convictions.

**B R O W N,** J., dissenting:

¶**51**       I agree with the majority that the officer's access to the DEASIL data was not a search under the Fourth Amendment. Our record does not contain information sufficient to say that the DEASIL data intruded on Sidor's reasonable expectation of privacy, though other cases have shown that this kind of data can be far more expansive and detailed in describing a person's whereabouts. Thus, I am concerned such information may come closer to re-creating a person's movements and capture images unrelated to where the person has traveled, warranting more rigorous Fourth Amendment scrutiny. *See United States v. Ceja-Torres*, No. 3:21-CR-141-CHB, 2022 WL 9936376, at *4 (W.D. Ky. 2022) (DEASIL search revealing three pages of results, tracking defendant's movements through numerous states over 18 days); *Bowers*, No. 2:18-CR-00292-DWA, at *1 (ALPR search finding 106 entries on 33 different locations over the course of five months); *see also Yang*, 958 F.3d at 864 (Bea, J., concurring); David J. Mudd, *Privacy Impact Assessment for the National License Plate Reader Program (NLPRP)*, Drug Enf't Admin. (Apr. 19, 2019), https://www.dea.gov/sites/default/files/2023-03/DEA%20NLPRP%20 PIA%20r1.pdf (explaining that ALPR images may capture "the environment surrounding the vehicle, which may include drivers, passengers, passersby, and/or other license plates").

¶**52**       I also echo the majority's concerns addressing the officer's automatic certification to the DEA that he had reasonable suspicion of narcotics trafficking based only on Sidor's driving position. No reasonable interpretation of such conduct permits an inference of criminal activity, much less drug trafficking. I am particularly concerned that the officer testified he was trained to always check the box indicating he has reasonable suspicion of narcotic trafficking and bulk cash smuggling. Though our record does not indicate why the DEA has such a requirement, the DEA has made it clear that access to such data is limited to those "who have an investigative need and reasonable articulable suspicion that a particular license plate is involved in criminal activity" or if such information "is relevant to the mission of a traffic stop." *Id.* If cases like this (accessing DEASIL *before* the traffic stop in violation of access requirements) become the norm, use of that data to support a finding of reasonable suspicion is problematic if there is no evidence indicating who was driving the car when prior ALPR data was gathered.

¶**53**       Turning to the lawfulness of the warrantless search, I disagree with the majority's conclusion that the officer had reasonable, articulable suspicion to believe criminal activity was afoot. *See Sweeney*, 224 Ariz. at

18

112, ¶ 17. The information the officer acquired through accessing DEASIL was too vague and incomplete for the officer to infer a pattern of travel to indicate that Sidor was trafficking drugs. *See id.* at 113, ¶ 22 (Reasonable suspicion cannot rest solely on "circumstances or factors that do not reliably distinguish between suspect and innocent behaviors . . . because they may cast too wide a net and subject all travelers to 'virtually random seizures.'").

¶54 The majority states that the DEASIL data showed the vehicle Sidor was driving "may have involved . . . going to and coming from California." *Supra* ¶ 29. The majority thus acknowledges there is no evidence in the record showing the car was actually used for the earlier trips to California. Instead, the only inference that the prior trips from the car Sidor was driving were to California appear to flow from the officer's testimony at the suppression hearing where, without explanation, he simply indicated that the DEASIL data showed "two previous one-day turnaround trips from the Minnesota area to Southern California." The DEASIL data, however, merely showed that the car had been driven through northern Arizona three separate times and once in Kansas. The only trip with a confirmed California destination was that from Kansas, as Sidor acknowledged that he had just come back from California.

¶55 Nothing about this car's whereabouts nor Sidor's explanation of his travel shows there was reasonable suspicion of criminal activity. *Cf. United States v. Simpson*, 609 F.3d 1140, 1148–52 (10th Cir. 2010) (noting that implausible or inconsistent travel plans may contribute to reasonable suspicion, but that merely unusual plans do not contribute to reasonable suspicion). Other than speculation, the record does not show the car had been in California before Sidor's current trip, and even if such an inference can be reasonably drawn, nothing shows he was driving the car on those alleged "two previous one-day turnaround trips from the Minnesota area to Southern California."

¶56 And regardless of the vehicle's destination, the State has not met its burden of showing how the DEASIL information indicates potential criminality. *See Rodriguez v. Arellano*, 194 Ariz. 211, 215, ¶ 12 (App. 1999) ("[A] defendant who establishes that evidence was seized pursuant to a warrantless search has satisfied the burden of going forward under [Rule 16.2] and has triggered the State's burden of proving the lawfulness of the acquisition of the challenged evidence.").

¶57 Beyond a generic affirmation that this information was "indicative of drug trafficking" based on the officer's training and experience, the officer never explained *how* such incomplete information

would indicate some sort of criminal activity. Though an officer can "perceive and articulate meaning" in seemingly innocent conduct that would imply criminal activity, the officer needs to articulate what that meaning is for courts to assess whether there are objective grounds for extending a stop. *See e.g.*, *United States v. Gooding*, 695 F.2d 78, 82 (4th Cir. 1982) (citation omitted); *see also State v. Boteo-Flores*, 230 Ariz. 105, 108, ¶ 12 (2012) ("[S]eemingly innocent behavior can form the basis for reasonable suspicion if an officer, based on training and experience, can 'perceive and articulate meaning in given conduct[,] which would be wholly innocent to the untrained observer.'") (citation omitted); *United States v. Johnson*, 171 F.3d 601, 604 (8th Cir. 1999) ("[T]he Fourth Amendment requires an officer to explain *why* the officer's knowledge of particular criminal practices gives special significance to the apparently innocent facts observed."); *State v. Harning*, 507 P.3d 145, 150–51, ¶ 20 (Mont. 2022) (finding that a stop was improperly extended when an officer asserted he observed "subtle kinds of things" about the defendant's behavior without any explanation as to how they were consistent with criminal behavior); *State v. Wills*, 930 N.W.2d 77, 81–82, ¶¶ 17–18 (N.D. 2019) (finding that an officer's conclusion that "something just didn't seem right" based on a group of passengers' smoking, indirect travel route, and criminal histories did not meet reasonable suspicion); *Hodnett v. Commonwealth*, 530 S.E.2d 433, 436 (Va. Ct. App. 2000) (noting that continued detention of defendant was not unreasonable when an officer explained that based on his experience, drivers who have an identification card did not hold an operator's license).

¶58 When asked about the prior trips, the officer stated only that it was indicative of "[s]ome kind of criminal activity." His vague assertion shows he was acting on a mere hunch rather than reasonable, articulable suspicion. *See Teagle*, 217 Ariz. at 23, ¶ 25 (recognizing that reasonable suspicion must be more than an inchoate hunch).

¶59 Nothing else presented at the suppression hearing otherwise convinces me that the officer had reasonable suspicion. I agree with the majority's conclusion that the officer's testimony of Sidor's nervousness throughout the stop was not compelling. The officer testified that Sidor was breathing rapidly, "would not make eye contact" and that he "kept looking around" while they were talking. At several points, the officer stated he could see Sidor's carotid artery pulsing. My review of the video does not align with the officer's descriptions.

¶60 The officer's actions before stopping Sidor cast further doubt on a finding of reasonable suspicion of criminal activity. Though the officer noted that he pulled Sidor over for following a semitrailer too closely, a

practice he described as unsafe, he allowed Sidor to remain unsafely close for two miles. This was because the officer's vehicle was not equipped with an ALPR; the officer had to manually enter the data into a laptop in his computer. After seeing the traffic violation, the officer saw that Sidor's car had a Minnesota license plate, and then determined that he needed to begin a search query for the car. After exiting the median, however, the officer testified that he believed he had "reasonable articulable suspicion that Mr. Sidor, or whoever [was] driving that vehicle, was associated with narcotic trafficking or bulk cash smuggling[.]" That purely speculative assertion lacks any basis in Fourth Amendment jurisprudence.

¶61        I recognize that reasonable suspicion cannot be dismissed by examining various factors in a vacuum and finding them individually innocent. *Id.* at 24–25, ¶ 25. Even a host of innocent factors, when viewed in their totality, may give an officer reasonable suspicion. *Id.* But even viewed together, these factors do not meet the threshold required for reasonable suspicion. Because the officer did not explain how he could discern criminality in the limited DEASIL data, and the evidence fails to sufficiently "eliminate a substantial portion of innocent travelers," he lacked reasonable suspicion. *Id.*

¶62        Moreover, the conclusion that accessing the DEASIL data in this case does not constitute a search under the Fourth Amendment cuts against any finding that the officer had reasonable suspicion to further detain Sidor. As the majority recognizes, the DEASIL data showed that the car Sidor was driving included a single picture of the license plate, along with a record of the couple of prior trips the car made through northern Arizona. However, when discussing reasonable suspicion, the majority decides the data creates a pattern of the vehicle's movements from which the officer was able to reasonably suspect that Sidor was engaged in drug trafficking. In other words, the majority concludes the DEASIL data sufficiently details Sidor's movements to create reasonable suspicion, but at the same time says those movements are essentially meaningless in terms of assessing a potential Fourth Amendment violation.

¶63        The trooper acknowledged at the evidentiary hearing that the records check disclosed nothing amiss about Sidor or the car he was driving and the answers he gave during the stop did not reveal any inconsistencies with other information provided by Sidor or otherwise known to the trooper. Ultimately, the fact that Sidor was driving a borrowed vehicle making its third trip out west in a little more than two months does not provide reasonable suspicion that he was engaged in drug trafficking.

Because the superior court erred in denying Sidor's motion to suppress, I would reverse the convictions.



AMY M. WOOD • Clerk of the Court
FILED:    AGFV